All right. I'll ask you the same question I asked Mr. Turner. How many arguments for a good friend? I'm going to ask him too. But about 90. May it please the court, I'm here today for Ronnie Collins. The issue in this case is whether the district court's restriction on cross-examination significantly affected the jury's ability to evaluate the credibility of the key witness, Anthony Lopez. It did. Twice, the district court prevented defense counsel from asking a question that would have gone to explore Mr. Lopez's motives for testifying and his biases. As the Supreme Court taught us long ago, motive and bias are always relevant for discrediting the witness and affecting the jury's determination. So part of it was objecting to information about the name of Lopez's godfather, is that correct? That's correct. Or the person he characterized as a godfather. All right. So explain to me how that was relevant to Lopez's credibility. Well, he was testifying about being a drug dealer. He was testifying about the drugs that he was bringing to San Antonio. Defense counsel was questioning him about the circumstances. And he said, who is this your father-in-law? He said, no. He denied that flatly. He said, well, who is it? He said, godfather. Now godfather is a vague and distancing term. And what defense counsel was trying to get at is that Lopez may be casting blame on Collins in order to protect Lopez's own family and people. And it was relevant for the jury to hear that Lopez was trying, by using vague terms like godfather, to shift blame away from his family and onto Collins. Another reason I think it's... But the question was, what was the name, what's the name of your godfather? Correct. Couldn't you ask about your relationship to him? What's the nature of the relationship? Couldn't you have explored further and asked other, I say you, whoever was doing the trial? I understand your... It just seems to me there are lots of other questions that could have been asked other than what's the name of the godfather. I just don't see how damaging it is that he wasn't allowed to say the name. Well, I guess I would say to that, your honor, that obviously there are a lot of other things that could have happened. This is what did happen. He asked the name, and I think what we see is he got shut down. Now, would it have been best if counsel had then made a proffer and say, this is my opening question that is going to go into some of the things that you're suggesting? I wish that had happened. But I reason it's important is if Lopez had tried to point blank avoid answering that question, that would show some bias, some motive, and it would show that he was afraid of other people, but he was willing to cast blame on Mr. Collins. And so for that reason, I think it was, well, not perhaps the most felicitously phrased question or the one that some of us would have chosen. It was a relevant question, and it would have provided an answer and a reaction that the jury could have used in evaluating Mr. Lopez's motives and biases. I think the same is true of the second question. Would it surprise you to hear that other people testify differently? The reason that this is relevant is because Mr. Lopez appeared to be perjuring himself, and it was a way of drawing attention to that because Lopez had, despite pleading guilty and despite signing and agreeing to a factual basis that he was the person that had brought the drugs into the house on August 31st, had testified that it was Mr. Collins that did that. The two, the agent who had written a report on that day had testified, and we know it was in his report that it was Mr. Lopez. Another agent who had watched it. Yes. And so what this question was designed to do was not to solicit an opinion on anyone else, but to elicit a reaction. And California versus Green long ago told us, reminded us, that part of the purpose of cross-examination is to see demeanor and reaction. And so if Mr. Lopez won't answer that question or disclaims surprise, then that's relevant information for the jury. And so I think that question too was relative. And you say, well, it's two questions in a trial, but it wasn't. Did it get into evidence that he had given inconsistent responses about who actually took the drugs into the house? Did that information get before the jury? Not that. I understand that question was designed to figure out whether or not he was surprised that he had said differently at another time, but did it ultimately get before the jury that he had given an inconsistent statement? It had, but I think this is important to look at how Lopez wanted to phrase it in his direct. He claimed that it was a minor issue, minor issue, that his plea agreement said that he was the one that took the drugs into the house. Well, that wasn't a minor issue. That was something that made him very responsible. And by shifting . . . I mean, didn't he admit, I don't know if it was direct or cross, that he lied about it or he had initially said that or whatever? I mean, in other words, he himself said, yeah, I contradicted myself. I don't think he said it in that kind of way. I'm paraphrasing, but I mean, he dealt with the issue, I guess. I think he was, in calling it a minor issue, he was pretending that this isn't important. And the question was designed to show that it was important. But he also conceded he changed his story. He conceded that, yes, that when he pled guilty, he said one thing, and now he was blaming it on Collins. But I think it was important and relevant for the jury to see how he would react to that. The prosecutor leading him through and being able to say it's a minor issue, it's not a big deal. What is a big deal for Mr. Collins? Because Mr. Collins is going to end up being convicted. So to allow the jury to see what Lopez is going to say and how he's going to react is, I think, important. This was not a particularly strong case for the government. Mr. Lopez is pretty much the person who puts Mr. Collins in it all. If we accept the agent's testimony that Mr. Lopez is the one who went in the house, and we have two agents that say that, and the agent, Hutchison, says he didn't see Mr. Collins that day. He didn't know who was driving the car that Mr. Lopez got out of. He got a real good look at Lopez. Lopez actually came over and talked to Hutchison. But the argument you're making now, if I'm the lawyer representing Mr. Collins at the trial, I make that same argument to the jury. If they heard the testimony of the agent who said Lopez went into the house, and then they hear Lopez saying Collins went into the house, you have your argument foreclosed. But it's not just a matter of having the argument, Your Honor. It's having the argument without having had the benefit of being able to ask those two cross-examination questions that might make the jury think differently about that argument. And that's where the harm is from restricting on these questions. That the argument may have sounded different to the jury if it had heard this additional information. If it had been able to watch Mr. Lopez answer, or perhaps not answer, these questions. That that would have given the jury additional information that might have significantly, that did significantly affect its credibility determination in this case. Because the other evidence just isn't that strong. The text messages from R.T. Well, there's no evidence in the record that anyone called Ronnie Collins R.T. It's not a phone number that the government connects to Ronnie Collins. So Lopez comes in and says, oh, these messages about drugs, R.T., yeah, that's Mr. Collins. And so Mr. Lopez's credibility is critical to the evidence that suggests in any way that Mr. Collins might be involved. They stopped Mr. Collins twice. They ran a dog on his car. No drugs. They don't have other text messages that are actually attributable to him that show it. And we know well from a long line of cases from this court that mere presence and association is not sufficient to show participation in a conspiracy. And in this case, while it's only two questions, I think it made a difference. And I think the arguments that he did, in fact, get a chance to make Judge Graves might have sounded, would have sounded differently had he been allowed to ask these questions. And so we would ask the court to vacate and remand for a new trial. You've saved time for rebuttal, Mr. Judge. Yes, Your Honor. Thank you. Mr. Durbin. May it please the court, Richard Durbin for the United States. Now you can answer the same question. It's over 100, but I'm not sure how much. Thank you. It's been a lot. And I hate to say that because I don't know that this one will go necessarily well because of that, but we'll see how it turns out. Anyway, to answer some of the court's questions, I'd like to point out, first of all, with respect to— Tell me what's objectionable about what's your godfather's name. What's objectionable about that question? Do you know the basis for that objection? It was relevance, and the district court said it's not relevant, that the name of the godfather isn't relevant. And your questions suggest to me the way I read it is I don't understand what the name's relevance is. It could be dangerous. I don't know if there was ongoing investigation and we didn't want that out, but it wasn't relevant to the question of what is the nature of the relationship. If indeed the defense was Mr. Lopez is trying to cover for his source, that was not the defense, by the way. That wasn't the opening statement. That wasn't the closing. That's not what the defense was about. And so I don't think, first of all, it was relevant because that's not what the defense was, and second of all, the name itself I don't think was relevant. The defendant had the opportunity to inquire what is the relationship between Mr. Lopez and his son-in-law. He asked, is it your father-in-law? No. He asked after the objection was sustained, where is your godfather from? He's from Laredo. So if he really wanted to develop information about what is the nature of the relationship and is that somehow a motive for Mr. Lopez's testimony, he had the full opportunity to do it. The sustaining the objection to that one question did not impede his ability to cross-examine into that subject area. Anyway, that's the way I read the record. That's it. Basically pages 712 and 713 of the record. With respect to the overall question, I'd make a couple of observations. As Mr. Lynch points out, there were two questions that were objected to. There were 34 pages of transcript of cross-examination, and there was ample opportunity and there was ample cross-examination on matters that went to Lopez's credibility, that went to his motives, and went to his bias. And it went into what his plea deal was, what the circumstances were, what he was expecting from the plea deal, that he was expecting concurrent sentences capped at 135 months. There was questioning about all manner of circumstances that went to, let me get my notes just to make sure I got it right, consideration for pleading and testifying, inconsistency between the factual basis which the defense put into the record and the trial testimony, the absence of any reference to Collins in the factual basis, whether he told the government that the factual basis was incorrect, went into the implausibility of his explanation of what his relationship was, other inconsistencies, as well as his illegal possession of a gun and drugs in his house at the time of his arrest, which were inconsistent with his testimony that he didn't want to be for that. The district court . . . the defendant did not argue at trial for the relevance of that information. The government objected and the defendant moved on. In fact, there was a later question that Mr. Lara posed to the witness about the identity of the driver of a load vehicle in which, again, there was an objection to the naming of that driver. It was sustained and Collins' lawyer said, okay, Judge, which makes me think that he understood that it was not relevant. I think that's what the record reveals. That goes to the standard of review. I'm not sure that it was preserved, but I don't think that it makes a difference in this case. I don't think this case turns on the standard of review. With respect to the harm that was done, I would point out the jury acquitted Mr. Collins on the count that pertained to the testimony about who carried the drugs into the house on August the 31st. That was the only drug delivery in this case, by the way. There were two substantive drug counts, two counts, a conspiracy count, and then the substantive count possession with intent to distribute. There was questioning of Lopez by Mr. Collins about whether he told the government that. Mr. Lopez evaded the question. He didn't answer it, but I would point out that the government did not rely on Lopez's testimony in its opening or its closings to argue that Mr. Collins was the one who delivered the drugs on that date. He essentially gave it up, is the way I read the record. Even if there was some limitation on cross-examination, there was ample cross-examination on the other issues of credibility and bias. On this particular count, I think the jury found him not credible. And so, whatever that cross-examination was, it was effective and the government didn't even argue for his testimony. And, in fact, the government brought out the fact there was a contradiction between the factual basis to his plea and what he was saying in court. And, indeed, before Lopez testified, there was testimony of a surveillance agent, DEA Agent Hutchison, who also testified that Lopez was the one who went into the house on August the 31st, and he did not see and did not identify the defendant, Collins. And our closing argument was based on basically an aiding and abetting type theory for the delivery on that date. Notwithstanding that, the jury found, obviously, reasonable doubt and did not convict on that particular count. So, I think if you look at the matter of the harmfulness, if there was harm from the district court's rulings, I don't think there was harm in this instance. Moreover, I sent the case, a case called Perez, an unpublished case, in a 28-J letter, and I also cited in the brief a case called Johnston at 123rd F3rd. And I think those point to the relationship between the question about confrontation and the question about a district court's ruling on the admissibility of information that may limit confrontation. And in this particular case, both of the district court's rulings as to those specific questions were sound. They were sound. The relevance was a sound ruling, and the court's determination that, well, the court sustained the objection to the question about, would you be surprised if the agents said something different? The court sustained that on the basis of hearsay. I'm not sure that it was hearsay, but I think that it was a proper ruling because of ample authority, including Johnston, that says that's an improper type of question. It's basically trying to impeach a witness on somebody else's statement, and that's what was going on here. That's not proper. There are other ways that the defense could have brought out the conflict, and in fact, they did bring out the conflict, and in fact, it was argued. The conflict was very clear. The government didn't dispute that there was a conflict between Lopez's plea and his trial testimony, and so that, again, goes to harm. Mr. Lynch made reference to, well, part of the problem with the case is basically the strength of the evidence because there was no connection to Collins' phone number. I would point the court to several things in the record. There was a government exhibit that was entered, government exhibit 10 at page 927 of the record, that is the phone subscriber information for the phone number that ended in 6,000, and it was subscribed to Ronnie Collins. There was ample corroborating evidence that that's the phone he was using. There was a phone call that was ... The phone call wasn't recorded, but there was a meeting recorded on August 31st where Holland made a call to the 6,000 number shown by telephone records and says, we're waiting for you, we're waiting on you, and agent or Detective Neal said he recognized on that recording Collins' voice, and then there was other circumstantial evidence or observations of phone calls between Holland and the Collins' 6,000 number and Collins' showing up at the trap house on Geaver Street. So there was ample evidence that established that 6,000 was Collins' number. And I think those are, I think I've answered, I think I've addressed your questions. All right, thank you. If there's nothing else, I'll sit down. Yes, thank you, Mr. Durbin. Mr. Lynch for rebuttal. Quick, Your Honor. This 6,000 number is Ronnie Collins' phone. It's not where the RT text messages came from. And the RT text messages are what Lopez says implicate Collins in the conspiracy. And so that's important. There's no evidence from the government about that phone that RT is using. There's no evidence that that's the 6,000 number, okay? They do have other calls, many, many, many pages. That's why the record got so big. You know, the way they bring in these, the phone company gives you the record, and of course the government hasn't introduced a whole thing. So there's thousands of pages of record. Ronnie Collins has a 6,000 number. That's not the number that RT has. And RT is the one that Lopez is doing the drug messaging with. And RT, the only person who says RT is Ronnie Collins, is Anthony Lopez. And so attacking his credibility in all ways, including through these two questions, is important. I think the fact that he was acquitted on the August 31st one shows how important this is, because Lopez was the conspiracy evidence. Those RT tweets, or tweets, text, are very, very harmful. And the only thing that connects it up to Mr. Collins is Lopez. I think the final point, I guess, which goes to what we're deciding here is, and I think after running through the confrontation things and how confrontation informs cross-examination in my brief, I say that, you know, this is basically an abuse of discretion case. Because as my friend points out, there was opportunity for cross-examination. This is not a case where the district court said, no, you can't do anything. It's a couple of questions. But it's a couple of key questions, and I believe that when we look at the relative weakness of the government's evidence, the inability to ask those couple of key questions did significantly affect the jury's ability to assess his credibility, and had those questions been asked, answered, and they could have seen Mr. Lopez's reaction, that the jury's determination would have been different. So we ask that you . . . Mr. Durbin indicated, if I understood him correctly, that after the objection, defense counsel did not then argue in favor of relevance. He basically just said, okay, or whatever. But can you respond to that? That is what the record reflects, Your Honor. I certainly would like it to be different, but I can't change the past. Thank you. Thank you, Mr. Lynch. Your case is under submission.